IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 7, 2020 Session

**KARTHIK RAJENDRAN v. MARY FLORENCE RAJENDRAN**

**Appeal from the Circuit Court for Sumner County**
**No. 2017-CV-600    Joe Thompson, Judge**

_____

**No. M2019-00265-COA-R3-CV**
_____

Mother appeals the trial court's decision to award the parties equal parenting time and to allow the parties to make major educational decisions jointly. We reverse the trial court's decision to order alternating weekly parenting time and vacate the trial court's decision regarding major educational decisions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed in Part; Vacated in Part; and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which ARNOLD B. GOLDIN and KENNY ARMSTRONG, JJ., joined.

M. Allen Ehmling, Gallatin, Tennessee, for the appellant, Mary Florence Rajendran.

Brandon R. Meredith, Gallatin, Tennessee, for the appellee, Karthik Rajendran.

**OPINION**

**BACKGROUND**

Plaintiff/Appellee Karthik Rajendran ("Father") and Defendant/Appellant Mary Florence Rajendran ("Mother") were married in May 2013 and had a daughter in February 2015. Father filed a complaint for divorce in Sumner County Circuit Court ("the trial court") on June 24, 2017. As the litigation progressed, both parties sought to be named primary residential parent to their daughter. The trial court entered an agreed order setting a *pendente lite* parenting schedule where Father would receive parenting time from Thursday night to Sunday night three weeks per month.[1] The issue of parenting time was

_____

[1] This plan allowed Father only 108 parenting days per year, compared to 257 for Mother.

not resolved during mediation and was set to be determined at trial. Both parties filed proposed parenting plans before trial.

The trial court heard testimony on the matter on December 13, 2018. Only the parties testified, both of whom requested to be named primary residential parent and to be given sole decision-making authority over major educational decisions.[2] Mother asked that Father be awarded visitation consistent with the temporary parenting plan; Father asked that the parties be granted equal parenting time.

Several issues concerning the child were discussed at trial, including the parties' residences, educational plans, and visitation issues. At the time of trial, Father was renting a home in Millersville, Tennessee.[3] Father began living in the home in November 2018. Father testified, however, that it was his preference to return to Williamson County, where his job, his church, and even better schools were located. Nonetheless, Father later testified that in lieu of returning to Williamson County, he was "willing" to purchase a home in Hendersonville, Tennessee, due to its excellent schools. Father testified that he wanted to move the child to a different daycare because it had a better facility and curriculum and would increase her chances of being admitted into a magnet school.

Mother began residing in her current home in Gallatin, Tennessee, in November 2018. The home was purchased by Mother's parents and would be gifted to Mother following the divorce. Mother's parents and extended family live in Virginia. Mother denied that she had any intention of moving to be closer to her family, despite Father's belief otherwise. However, Mother testified that her family visits Tennessee often, with the child's maternal grandmother sometimes staying for months at a time. As such, the child is able to maintain a close relationship with Mother's extended family.

Although Mother was a stay-at-home parent during the marriage, by the time of trial, Mother was working full time in the local high school as a French teacher. Father, however, took issue with the local school district compared to the schools that he was considering. In contrast, Mother testified that the child's current daycare had a good curriculum and that there were several options for education once the child reached kindergarten age where she lived, including public, magnet, and private schools. Mother testified that she disagreed with Father's choice of daycare, which she said she learned about only the day before trial. Mother testified, however, that she had previously visited the proposed daycare and that she had concerns about the child attending there due to how loud part of the school where the children spend a significant amount of time was.

Issues related to the temporary parenting plan were also discussed at trial. Father

---

[2] Both parties agreed that some of the other decisions could be made jointly; only the trial court's ruling with regard to educational decisions is at issue in this appeal.

[3] Father testified that although his address is Goodlettsville, he lives in Millersville.

admitted that while he had previously asked to have visitation with the child on Fridays because he could work from home, he later decided to place the child in daycare on those days. Although Mother asked to drive to Father's residence to get the child on those days, Father ultimately denied her that opportunity, believing that it would be held against him later. Father also testified that it was appropriate for him to place the child in daycare because Mother had allowed the child to attend a Mother's Day Out program even when she was not working.[4] Father testified to another incident in which Mother asked that he come to her driveway to pick up the child because she had car trouble. Father asked police to accompany him to Mother's home. When Father was unable to obtain a police escort, he refused to pick up the child.

Father testified that his "paranoi[a]" that caused these incidents was the result of Mother's own bad conduct in taking out an order of protection against him in Virginia. Father testified that the order caused him to lose contact with the child for approximately one and one-half months. Father was arrested in Virginia after he admittedly violated the order by having a friend contact Mother. Mother, however, later returned to the marital home and dismissed the charge, as the charge threatened Father's employment. Still, Mother sought a second order of protection in Tennessee, which prevented Father from seeing the child for seventeen days. Following a hearing, a permanent order of protection was denied by the Tennessee court.

Mother also claimed that despite having phone calls with the child twice per week, Father missed some twenty calls and often used his time to speak with Mother, rather than the child. According to Mother, Father micromanaged her care of the child in an effort to manipulate her and stay in contact.[5] Other times, Mother claimed that Father refused to discuss issues that arose during his own parenting time, including one incident where Father would not explain why the child's hair had been cut. Mother also testified that the child is sometimes "very distressed" and "very clingy" upon returning to her from visits with Father. Indeed, Mother testified that although Father had been given a chance to develop a relationship with the child during the pendency of the divorce, she did not believe he had done so. Mother therefore testified that the current plan in which she was given substantially more time with the child was in the child's best interest and should be implemented permanently. Mother admitted, however, that the child was capable of adapting if another plan was implemented.

Despite Mother's claim that Father was using the child to manipulate her into reconciling, Mother admitted that Father had not asked her to reconcile in the nine months

---

[4] Mother testified that the parties agreed to the child's enrollment in the program in order to expose the child to other children and a school environment. The daycare where Father placed the child on his Fridays was not the same program.

[5] For example, Father told the child during one call to throw away her Halloween candy because it was not safe. Other examples included Father allegedly demanding that the child be fed at a certain time or that she be clothed in only certain fabrics.

prior to the trial. Mother further admitted that she had changed the child's daycare without prior notice to Father. Father testified that during his parenting time, he would allow Mother to call the child every day and to see the child during his parenting time if there were events or celebrations in which the child should be included. Both parties testified that they regularly attended their respective church with the child and that the child was a happy, healthy young girl. Mother testified extensively about her typical routine with the child, her current home, and the child's personality.

Father testified that he wanted the opportunity to take the child to India to visit with his family for two weeks per year. Because of the distance, expense, and his parents' health issues, Father's family cannot easily visit Father in the United States. Consequently, the child has never physically met her extended family on Father's side; they are able to regularly Skype with the child. Mother testified that she was fearful that Father would take the child and never return. Father admitted that India is not a party to the Hague Convention and that he owned a home in India which he continued to build after his marriage, but testified that he would never deprive the child of her Mother by absconding to India with the child and never returning.

The trial court entered a final decree of divorce on January 11, 2019, that designated Mother as the primary residential parent. From the entry of the order until June 30, 2019, Mother was awarded substantially more time with the child. Beginning July 1, 2019, however, each parent was awarded 182.5 days with the child on an alternating weekly basis. The trial court further ordered that the parties would make all major decisions jointly, including major educational decisions. The trial court ruled, however, that the child would remain in her current daycare until the parties agree otherwise and that Father would not be allowed to take the child to visit India.

Mother timely filed a notice of appeal on February 11, 2019, the same day that Father filed a motion to alter or amend the permanent parenting plan. Therein, Father asked for the trial court to allow him to enroll the child in a different daycare on his weeks with the child. Father also asked that the parenting plan be modified to give him visitation on certain Hindu and American holidays.[6] The trial court largely denied Father's motion, except for granting Father parenting time during Diwali. After the record was filed in this Court, we entered a show cause order on June 6, 2019, ordering that the parties obtain a final judgment resolving a claim for alimony. A final judgment was entered on June 24, 2019.

## ISSUES PRESENTED

Mother raises the following issues, which are taken from her appellate brief:

---

[6] Father testified during trial that he converted to Christianity and attended a Christian church with the child.

- 4 -

1. The Trial Court erred in its ruling that the facts and proof in this case warranted equal parenting time and that this was in the best interest of the minor child.
2. The Trial Court erred in its ruling that the parties should have joint decision-making authority with regard to educational decisions.

### STANDARD OF REVIEW

It is well settled that, in matters of child custody, visitation, and related issues, trial courts are given broad discretion; consequently, appellate courts are reluctant to second-guess a trial court's determinations regarding these important domestic matters. *See* ***Armbrister v. Armbrister***, 414 S.W.3d 685, 693 (Tenn. 2013); ***Harwell v. Harwell***, 612 S.W.2d 182, 185 (Tenn. Ct. App. 1980). "It is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court." ***Eldridge v. Eldridge***, 42 S.W.3d 82, 88 (Tenn. 2001). As explained in *Richards on Tennessee Family Law*:

> Appellate courts correct errors. When no error in the trial court's ruling is evident from the record, the trial court's ruling must stand. This maxim has special significance in cases reviewed under the abuse of discretion standard. The abuse of discretion standard recognizes that the trial court is in a better position than the appellate court to make certain judgments. The abuse of discretion standard does not require a trial court to render an ideal order, even in matters involving visitation, to withstand reversal. Reversal should not result simply because the appellate court found a "better" resolution.

Janet L. Richards, *Richards on Tennessee Family Law* § 9-2 (2d ed. 2004) (quoting ***Eldridge v. Eldridge***, 42 S.W.3d 82, 85 (Tenn. 2001)). "An abuse of discretion occurs when the trial court . . . appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." ***Gonsewski v. Gonsewski***, 350 S.W.3d 99, 105 (Tenn. 2011). "A trial court abuses its discretion in establishing a residential parenting schedule 'only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record.'" ***Armbrister v. Armbrister***, 414 S.W.3d 685, 693 (Tenn. 2013) (quoting ***Eldridge***, 42 S.W.3d at 88).

### DISCUSSION

This appeal involves two decisions by the trial court relative to the parties' minor

child: (1) the equal parenting schedule; and (2) joint educational decisions. Mother argues that both decisions were an abuse of discretion. The parenting schedule is governed by Tennessee Code Annotated section 36-6-106:

(a) In a suit for . . . divorce, . . . or in any other proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child. In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in this subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors. The court shall consider all relevant factors, including the following, where applicable:

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;
(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;
(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;
(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;
(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;
(6) The love, affection, and emotional ties existing between each parent and the child;
(7) The emotional needs and developmental level of the child;
(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The

court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

*See also* Tenn. Code Ann. § 36-6-404 (stating that the same factors should be used to determine a residential schedule unless certain factors under Tennessee Code Annotated section 36-6-406, which are not applicable here, are dispositive).

The trial court made oral findings as to each of the above factors that it incorporated into its written order. Therein, the trial court ruled that five factors were not applicable,[7] six factors were equal,[8] and three factors favored Mother,[9] although the trial court gave some of these factors little weight. Mother asserts, however, that more factors favor her and/or should have been given more weight by the trial court. We will therefore consider

---

[7] These included factor three (3) regarding the refusal to attend a court ordered parent education seminar, factor seven (7) regarding the emotional needs of the children, factor eleven (11) regarding physical or emotional abuse, factor twelve (12) regarding the character of others residing in the home, and factor thirteen (13) regarding the child's preference.

[8] These included factor one (1) regarding the strength and nature of the relationship between the parent and the child, factor two (2) regarding the past and potential performance of responsibilities, factor four (4) regarding the disposition of the parent to provide necessary care, factor six (6) regarding the love and affection between the parent and child, factor eight (8) regarding the moral, physical, and mental fitness of the parent, and factor fourteen (14) regarding the parents' schedules.

[9] These included factor five (5) regarding which parent was the primary caregiver, factor nine (9) regarding the child's interactions with relatives, and factor ten (10) regarding continuity.

each of the disputed factors in turn.[10]

Mother first asserts that the trial court erred in finding that factor one (1) was equal. This factor considers the "[t]he strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child[.]" Tenn. Code Ann. § 36-6-106(a)(1). With regard to this factor, the trial court specifically ruled that "even though the mother has had more time, I do think the father has been able to take care of [the child's] daily needs when he's had her. So I find that to be an equal factor." Mother takes issue with this finding, as the evidence demonstrated that she was the child's primary caregiver both prior to the divorce and following the parties' separation. Moreover, Mother contends that Father presented no evidence to show that he had a strong relationship with the child. Indeed, the evidence indicated that Father chose to miss some of his time with the child, by missing scheduled Skype calls and placing the child in daycare when he had specifically promised to keep the child at home. Finally, Mother testified without dispute that the child was sometimes upset following visits with Father and clingy toward Mother.

Father argues that the trial court was correct in its assessment of this factor, as Mother seeks to use the temporary parenting plan, in which she was awarded more time with the child, against him. According to Father, Mother's position conflicts with Tennessee Code Annotated section 36-6-406(e), which provides that "[i]n entering a permanent parenting plan, the court shall not draw any presumptions from the temporary parenting plan." Father's argument, however, ignores the reality that Mother was the child's primary caregiver well before the entry of the temporary parenting plan. *Cf. **Brown v. Brown***, 571 S.W.3d 711, 723 (Tenn. Ct. App. 2018), *perm. app. denied* (Tenn. Jan. 18, 2019) ("The trial court erred by only considering the parties' division of parenting responsibilities since the temporary parenting plan took effect; the court should have taken a more holistic approach."). Indeed, Father admitted in his testimony that Mother was "the parent" to the child during the marriage while he worked. This factor therefore favors Mother.

Mother also takes issue with factor six (6), concerning "[t]he love, affection, and emotional ties existing between each parent and the child[.]" Tenn. Code Ann. § 36-6-106(a)(6). The trial court made no factual findings concerning its ruling other than that this factor was equal. Mother points to her own testimony that she enjoys a close and loving relationship with the child, as well as her detailed testimony of the activities that she pursues with the child. In contrast, Mother points out that Father offered no testimony about his love, affection, or care for the child, outside of his testimony concerning his church and his intentions regarding the child's education. Father asserts that even though he did not testify that he was close with the child or even that he loved the child, his strong

---

[10] We will not tax the length of this opinion with the trial court's findings as to the factors that are not in dispute on appeal.

relationship with the child was evident from his other testimony. In particular, Father points to his testimony that he wants the child to have the "best" life possible and the best educational opportunities. Father also points to his testimony that the child enjoyed church and had made friends there. Father further notes that Mother presented no evidence that he did not love or care for the child.

This factor is a close question, and we are unfortunately without the benefit of any specific findings from the trial court to inform our decision. It is true that Father's testimony was not specific with regard to his relationship with the child. Moreover, it appears that Father sometimes declined to spend time with the child when given the opportunity. Mother also testified without dispute that the child is sometimes distressed when returning to her care, often becoming "clingy" toward Mother. On the whole, we must therefore conclude that this factor indeed favors Mother, although not substantially, given that there really was no dispute that Father does have love and affection for the child.

Mother next contends that the trial court erred in finding that factor nine (9) did not weigh heavily in favor of Mother. Again, factor nine considers "[th]e child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities[.]" Tenn. Code Ann. § 36-6-106(a)(1). With regard to this factor, the trial court found in favor of Mother due to her role as primary caregiver, but ruled that the factor was not dispositive. We agree that this factor favors Mother on the basis of more than just her role as the child's primary caregiver. The evidence presented was that although Mother's family lives in another state, they frequently visit and the child is quite close to them. Father's family, on the other hand, is generally unable to visit from India due to the expense and health issues; as a result, the child has a closer relationship with Mother's family. Mother also testified extensively about the activities that the child pursues in her care. Father offered no similar testimony other than taking the child to his church. On the whole, we agree with the trial court that this factor favors Mother. Although we also agree that this factor is not dispositive, we must conclude that it is not irrelevant to the analysis.

Finally, Mother contends that factor ten (10), concerning continuity, weighs heavily in her favor. Tenn. Code Ann. § 36-6-106(a)(10). The trial court found that this factor favored Mother as she had been the primary caregiver, but only "very slightly[.]" Mother contends that this factor indeed weighs in her favor and that it should be given considerable weight. In support, Mother notes that she has been the child's primary caregiver for her entire life. Father argues again that it was only the temporary parenting plan that gave Mother substantially more time with the child; however, Mother served as the primary caregiver of the child even during the parties' marriage. Father also asserts that the plan giving Mother more time with the child was only a product of the circumstances at that time because Mother was then a stay-at-home parent. Because Mother is now working, Father asserts that there is no need to award her more time with the children. We agree that

the parties' work schedules are a relevant factor in the determination. Work schedules, however, are considered under a different factor, which the trial court found to be equal between the parties. This factor simply asks about "the importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment[.]" The evidence shows that Mother has been the child's primary caregiver for her entire life. It is true that Mother has recently moved to a new home; however, the move was necessary for purposes of the divorce. Mother's family owns this home, and Mother has full-time employment that indicates that she will remain in Gallatin long-term. Nothing in the record indicates that Mother's life in Gallatin is subject to upheaval in the near future.

The testimony regarding Father's future stability was less clear. At trial, Father initially testified that he wanted to move back to Williamson County, where his job is and where he believes the schools are better. Later, he stated that he would remain in Sumner County if required, but would move to another city where the schools were allegedly better. The trial court ruled, however, that no party would be allowed to move out of Sumner County without a significant uphill battle. While there is no indication that Father will not abide by the trial court's ruling that he remain in Sumner County, a move still appears to be in Father's future. As such, the evidence was far less convincing that Father's life will not be subject to future upheaval. All of the facts considered, we must conclude that this factor weighs in favor of Mother.

On the whole, then, five factors favor Mother, zero factors favor Father, and four factors are equal. Unlike the trial court, however, we cannot conclude that the factors that favor Mother should be given little weight. Here, even prior to the separation, Mother was, by Father's admission, "the parent" of the child. This fact, along with considerations of stability and continuity, heavily weigh in Mother's favor. In contrast, the love and affection toward each parent, though slightly favoring Mother, holds little weight in Mother's favor.

The fact that Mother has the most factors weighted in her favor does not end our inquiry, however. Rather, this court has explained:

> Ascertaining a child's best interests does not call for a rote examination of each of [the relevant] factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*Solima v. Solima*, No. M2014-01452-COA-R3-CV, 2015 WL 4594134, at *4 (Tenn. Ct. App. July 30, 2015) (quoting *In re Marr*, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005)).

Moreover, section 36-6-106(a) does not limit consideration to only the enumerated factors. Rather, courts may consider "[a]ny other factors deemed relevant by the court." Tenn. Code Ann. § 36-6-106(a)(15). The trial court made a multitude of additional oral findings at the conclusion of trial that inform our analysis on this issue:

> [Y]ou each have to trust the other. And I know there's a lot of water behind you that makes it difficult for either one of you to trust the other.
>
> How we got here today, and if you dwell on everything that happened up until today, you'll never be able to co-parent [the child] as well as if you just say today is day one. If you think about how you got here you're going to focus on how you met. How your personalities clashed with each other. How you see the world differently. How you can't agree on the time of day. And that's what will be forefront in your mind.
>
> But the reality is, [the child] . . . will be best served by having a close relationship with both of you. You both have to work on trusting the other to do what's best for her.
>
>     *   *   *
>
> I've certainly seen enough to lead me to believe that the two of you owe it to your daughter to try to reestablish trust with each other as co-parents, not as husband and wife.
>
>     *   *   *
>
> I think y'all should put that part of your life behind you. Figure out how you can trust each other not as husband and wife, but as [the child's] mom and dad. And that has to start somewhere.
>
> Somebody has to be willing to take the first step to trust. It doesn't have to be a big step but just a little step. But if each of you will try to build a little bit of trust with the other over small issues, then you can build trust over bigger issues and then your daughter will benefit from it.

The trial court gave specific directions to the parties concerning how they could communicate, i.e., only as necessary regarding the child.[11] Thus, the trial court found that the parties currently had a lack of trust,[12] could not agree on many things, and needed

---

[11] The trial court's specific comment on this issue was as follows:

> When the two of you -- and this came up only with respect to you, [Father] -- when you're talking to your daughter, when she's with her mother, you're not to use those conversations to talk to her mother. Period end of story. . . .
>
> I expect the communications between the two of you from now on be either, A, solely about [the child]. And you've agreed that we can limit those, I think, to text and e-mails, have we not? I think that will probably be the best thing. Or if it's about something other than [the child], you contact your attorneys. All right? . . . I'm hoping that doesn't happen. I'm hoping that we can move past that.

[12] Indeed, the trial court specifically noted during trial that based on earlier proceedings, it was

direction to effectively communicate.

Previously, this Court explained the necessary amount of cooperation that is inherent in an equal parenting arrangement:

> Joint custody arrangements are appropriate in certain limited circumstances. However, while authorized by statute, joint custody arrangements are generally disfavored by the courts of this state due to the realization that such rarely serves the best interest of the child.
>
> The statute does not require that joint custody be awarded only when the parents are on friendly terms, however, in order for a joint custody arrangement to serve the best interest of the child, it requires a "harmonious and cooperative relationship between both parents." "While we have stopped short of rejecting this type of custody arrangement outright, divided or split custody should only be ordered when there is specific, direct proof that the child's interest will be served best by dividing custody between the parents."

*Darvarmanesh v. Gharacholou*, No. M2004-00262-COA-R3-CV, 2005 WL 1684050, at *8 (Tenn. Ct. App. July 19, 2005) (citations omitted); *see also* *In re Emma E.*, No. M2008-02212-COA-R3-JV, 2010 WL 565630, at *6 (Tenn. Ct. App. Feb. 17, 2010) (applying *Darvarmanesh* to the question of whether an equal parenting arrangement should have been awarded); *Zabaski v. Zabaski*, No. M2001-02013-COA-R3-CV, 2002 WL 31769116 (Tenn. Ct. App. Dec.11, 2002) (finding joint custody appropriate where the record revealed the parents were able to communicate effectively regarding their son, they shared parenting and household duties while married, and one of the parties suggested a joint custody arrangement); *Martin v. Martin*, No. 03A01-9708-GS-00323, 1998 WL 135613 (Tenn. Ct. App. Mar. 26, 1998) (affirming the trial court's award of joint custody due to the fact that the parents had previously agreed to a joint custody arrangement); *Gray v. Gray*, 885 S.W.2d 353, 354-55 (Tenn. Ct. App. 1994) (finding that the evidence demonstrated that both parents were very active in the child's life and there was no apparent animosity between the parties).

Since the decision in *Darvarmanesh*, some important changes to Tennessee law occurred. In particular, Tennessee Code Annotated section 36-6-106(a) now provides that

> In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in this subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors.

---

aware of what the "parties have done to each other to create an environment of distrust" and that "there's enough blame to go around."

This Court, however, has indicated that this provision "does not mandate that the trial court establish a parenting schedule that provides equal parenting time[.]" ***Gooding v. Gooding***, 477 S.W.3d 774, 784 n.7 (Tenn. Ct. App. 2015). Rather,

> The plain language of [s]ection 36-6-106(a) directs courts to order custody arrangements that allow each parent to enjoy the maximum possible participation in the child's life only to the extent that doing so is consistent with the child's best interests. Indeed, the General Assembly has expressly declared that in any proceeding involving custody or visitation of a minor child, the overarching "standard by which the court determines and allocates the parties' parental responsibilities" is "the best interests of the child." Tenn. Code Ann. § 36-6-401(a) (2014)[.]

***Flynn v. Stephenson***, No. E2019-00095-COA-R3-JV, 2019 WL 4072105, at *7 (Tenn. Ct. App. Aug. 29, 2019) (quoting ***In re Cannon H.***, No. W2015-01947-COA-R3-JV, 2016 WL 5819218, at *6 (Tenn. Ct. App. Oct. 5, 2016)). Indeed, despite the additional language added to section 36-6-106(a), another section of our child custody and visitation statutory scheme continues to provide that "neither a preference nor a presumption for or against joint legal custody, joint physical custody or sole custody is established, but the court shall have the widest discretion to order a custody arrangement that is in the best interest of the child." Tenn. Code Ann. § 36-6-101(a)(2)(A)(i). As such, the maximum participation "aspirational goal" cannot be read as a preference for equal parenting time that significantly alters this Court's prior decisions on this issue. ***Gooding v. Gooding***, 477 S.W.3d 774, 778 (Tenn. Ct. App. 2015).

The same considerations that led the Court in ***Darvarmanesh*** to conclude that an equal parenting arrangement was not appropriate are present in this case. Specifically, there is continuing animosity between the parties and a marked lack of trust. Father continues to believe that Mother will remove the child to another state, despite the fact that she has planted strong roots in Tennessee. And Mother continues to believe that Father will abscond with the child to India, where she has no legal recourse, even though Father insists that he has no plans to permanently move there. *Cf.* ***Darvarmanesh***, 2005 WL 1684050, at *8 (noting that one consideration that weighed against joint parenting was the father's concern that the wife took the child overseas and would not communicate with the father). Father even admitted that following Mother's actions related to the orders of protection, he could not trust Mother "ever again." Father later testified that he would like to try to build trust but that he did not "know if" he could get over Mother's actions.

Father has also shown an unwillingness to be accommodating to Mother's requests for flexibility and cooperation in the parenting arrangement. *See* ***Dodd v. Dodd***, 737 S.W.2d 286, 289–90 (Tenn. Ct. App. 1987) ("The custodial parent should expect and receive cooperation and assistance from the non-custodial parent in every respect to serve

- 13 -

the best interests of their child or children."). For example, Father ultimately refused to allow Mother to pick the child up during his scheduled time after he placed the child in daycare contrary to his stated intentions. Another time, Father refused to pick the child up from Mother's home without a police escort when Mother told him that she was having car trouble. Although Father insists that such precautions were reasonable given Mother's decision to take out the order of protection in Virginia, we are unable to evaluate the reasonableness of his actions without more evidence concerning the facts that led to the order, particularly given Father's own admission that he willfully violated the order.[13] The fact alone that Father feels the need to take substantial steps to avoid confrontation weighs against a joint parenting arrangement. *See id.* (noting that the mother made substantial effort to avoid confrontation). Mother also testified to her concerns over Father's efforts to control the child, through the timing of her meals to the cotton content of her underwear while in Mother's custody. *See id.* (noting the father's concern that the mother's family was controlling).

Mother, however, was not without some blame. For example, Father testified that Mother transferred the child to a different daycare without his input and without prior notice. And of course, Mother did take out the order of protection on Father, only to return to the marital home thereafter. Mother also made no allegations regarding threats, stalking, or other harmful contact during the trial that would have supported an order of protection; her only complaints against Father dealt with his alleged controlling nature and manipulation.

Father argues, however, that other caselaw demonstrates that the trial court's decision to fashion an equal parenting arrangement was not an abuse of discretion, citing ***Woolbright v. Woolbright***, No. M2016-02420-COA-R3-CV, 2018 WL 934815 (Tenn. Ct. App. Feb. 16, 2018). In ***Woolbright***, the trial court found that four factors weighed in favor of the father, five factors were equal between the parties, and one factor weighed slightly against the father, *i.e.*, in favor of the mother. The trial court ordered an equal parenting arrangement, which the father disputed on appeal. ***Id.*** at *7. We ultimately held that the trial court did not abuse its discretion in this arrangement, as we noted that the majority of the factors weighed equally and that the particular circumstances of the case indicated that equal parenting time was in the child's best interest.

---

[13] The only evidence concerning the order was that Mother obtained an order of protection in Virginia that prevented Father from seeing the child for one and one-half months. Mother then returned to the marital home with Father. Mother's later attempt to obtain a second order of protection in Tennessee was not successful, although it did prevent Father from seeing the child for more than seventeen days. According to Mother, she "explained to [the Tennessee] Judge what happened and he saw it in a different way." Although Father's counsel insinuated that Mother lacked credibility in seeking the order of protection, the trial court cut off that line of questioning after noting that it was aware of the earlier proceedings and that there was "enough blame to go around[.]" As such, the transcript does little to illuminate the circumstances that led to the order of protection.

- 14 -

Respectfully, *Woolbright* is not analogous to the present situation. For one, the majority of the factors in this case are not equal, but favor Mother. Indeed, not a single factor actually favors Father alone in this case. Even more importantly, however, the trial court in *Woolbright* specifically found that the parents shared the daily hands-on parenting of the child. That is simply not true in this case. Even prior to the parties' separation, the proof shows that Mother was the primary caregiver of the child. Moreover, although the opinion in *Woolbright* discusses two instances in which the parties did not show a willingness to facilitate the relationship of the other parent with the child, there is no discussion in *Woolbright* of any serious lack of trust between the parties, allegations that one parent was controlling, or that the parties were unable to be flexible and cooperative in parenting the child. These facts are present, however, in this case, and are highly relevant to the determination of whether an equal parenting arrangement is in the child's best interest.

On the whole, it appears that the parties' continuing lack of trust and inability to cooperate are barriers to the joint parenting arrangement ordered by the trial court. Moreover, even Father's own motion to alter or amend illustrates the problems that are inherent in the trial court's decision. Here, the trial court specifically ruled that the parties would keep the child enrolled in her current daycare. Father, however, sought to enroll the child in a different daycare where he lives only on the weeks of his visitation, citing the distance and travel time required for Father to take the child to the ordered daycare in Gallatin. Father's proposed arrangement, however, would result in the child attending two different daycares on an alternating weekly basis. While this arrangement may have been more convenient for Father, the constant upheaval for such a small child is certainly not in the child's best interest, and the trial court rightly rejected Father's request.

Still, Father's request demonstrates two important facts. First, the request indicates that Father disagrees with both the trial court and Mother as to the daycare chosen for the child and wishes to have control over that aspect of the child's life when the child is in his custody, despite the trial court's clear order otherwise. Second, Father's request is essentially an admission that the joint parenting will create inconvenience for the parties due to the distance between their respective homes. A significant distance between parents is a factor that can support a finding that an equal parenting arrangement is not in a child's best interest. *See Poole v. Kinslow*, No. M2018-00324-COA-R3-CV, 2019 WL 5721834, at *6 (Tenn. Ct. App. Nov. 5, 2019) (considering this fact, along with the mother's role as the primary residential parent, in denying the father's request for equal parenting time). Thus, Father's own motion to alter or amend illustrates that an equal parenting arrangement is not in the child's best interest in this particular case. Rather, the evidence presented and the factors contained in section 36-6-106(a) favor awarding Mother more visitation than Father. The trial court's judgment is therefore reversed, and this matter is remanded for the entry of a parenting plan in which Mother is named the primary residential parent and Father is awarded liberal, though not equal, visitation.

We note, however, that "[e]vents and lives have not stood still while this custody dispute has been in the courts." ***Wall v. Wall***, No. W2010-01069-COA-R3-CV, 2011 WL 2732269, at \*26 (Tenn. Ct. App. July 14, 2011) (quoting ***Gorski v. Ragains***, No. 01A01-9710-GS-00597, 1999 WL 511451, at \*4 (Tenn. Ct. App. July 21, 1999)). Accordingly,

> when a trial court is directed to reconsider an issue on remand that involves the circumstances of children and their parents, "the trial court should endeavor to ascertain and give effect to the parties' actual circumstances, which will necessarily change over the course of time, e.g., people remarry, have more children, insurance premiums rise and fall, and child care needs change." Accordingly, the trial court may, in its discretion, consider such additional evidence to insure that any custody order is based on "the parties' actual circumstances."

***Kathryne B.F. v. Michael B.***, No. W2013-01757-COA-R3-CV, 2014 WL 992110, at \*7 (Tenn. Ct. App. Mar. 13, 2014) (internal citations omitted) (quoting ***In re C.W.***, 420 S.W.3d 13, 22 (Tenn. Ct. App. 2013)). In the interim, we reinstate the temporary parenting plan that the parties were following during the pendency of the divorce proceedings. *See id.* ("In the interim, we reinstate the custody arrangement ordered by the trial court during the pendency of the divorce proceedings.").

One additional issue was raised by Mother in this appeal: the trial court's decision to order the parties to jointly make all major educational decisions.[14] As noted above, however, the parties have a serious lack of trust and sometimes an inability to cooperate. These issues have led us to reverse the trial court's decision to order equal parenting time and remand for the entry of a new parenting plan. Similar concerns are relevant in determining whether the parents can make joint major educational decisions. *See **Coley v. Coley***, No. M2007-00655-COA-R3-CV, 2008 WL 5206297, at \*7 (Tenn. Ct. App. Dec. 12, 2008) ("Despite their inability to agree, the court gave the parties equal decision-making authority, including decisions involving the children's education and their extracurricular activities. We find this decision inconsistent with the trial court's specific findings that the parties were unable to agree on a number of matters regarding their children."). Indeed, the cooperation of the parties is a factor that must be considered in allocating decision-making authority. Under Tennessee Code Annotated section 36-6-407(c), the court shall consider the following criteria in allocating decision-making authority:

---

[14] Mother also asks for attorney's fees incurred on appeal in a single sentence in the body of her brief. This request was neither designated as an issue nor supported by relevant legal authority. Therefore, it is waived. *See, e.g.,* ***In re Samuel P.***, No. W2016-01665-COA-R3-JV, 2018 WL 1046784, at \*21 n.13 (Tenn. Ct. App. Feb. 23, 2018) (waiving a request for appellate attorney's fees where the party did not cite any basis for the award or designate the claim as an issue on appeal).

(1) The existence of a limitation under § 36-6-406;

(2) The history of participation of each parent in decision making in each of the following areas: physical care, emotional stability, intellectual and moral development, health, education, extracurricular activities, and religion; and whether each parent attended a court-ordered parent education seminar;

(3) Whether the parents have demonstrated the ability and desire to cooperate with one another in decision making regarding the child in each of the following areas: physical care, emotional stability, intellectual and moral development, health, education, extracurricular activities, and religion; and

(4) The parents' geographic proximity to one another, to the extent that it affects their ability to make timely mutual decisions.

*See also* **In re Grace N.**, No. M2014-00803-COA-R3-JV, 2015 WL 2358630, at *12 (Tenn. Ct. App. May 14, 2015) (holding that the statutory factors did not support joint decision-making because one party was historically the primary caregiver of the child and the trial court found that the parties were not able to effectively communicate). The trial court, however, did not make any findings specifically addressing this statute. Rather, the trial court simply found that the parties "have not shown to me that you cannot make decisions together. And I believe you can."[15] In light of our decision to remand the parenting plan issue, we believe that the best course of action is to vacate the decision of the trial court and remand for reconsideration in light of this Court's opinion, the changed parenting plan, section 36-6-407(c), and any changed circumstances that the trial court, in its discretion, chooses to entertain. If the trial court nevertheless finds that joint education decisions remain in the best interest of the child, the trial court is directed to make specific findings of fact in support of that decision.

## CONCLUSION

The judgment of the Sumner County Circuit Court is reversed in part, vacated in part, and remanded for further proceedings consistent with this Opinion. Costs of this appeal are taxed to Appellee Karthik Rajendran, for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE

---

[15] The trial court made this finding prior to its findings detailed earlier in this Opinion regarding the parties' lack of trust and inability to agree "on the time of day."

- 17 -